Good morning, Your Honors. Joel Pfeffer for the Plaintiff Appellant Richard O'Donnell. May it please the Court, AXA developed a variable annuity product which allowed policyholders to invest aggressively while protecting against downside risk by purchasing for an additional premium, a hedge in the form of a guarantee that, come what may, the policyholder could not lose money in any given year. At some point, AXA realized that it made a big mistake. This is a zero-sum thing. If the plaintiff avoided loss, AXA assumed the loss. After they changed it to cut to the chase, did they continue to collect the additional premium? I believe so. What AXA did was it unilaterally amended the annuity contracts to add a hedge in the form of derivatives to protect its interest during periods of high volatility, and they called this the ATM strategy. Remarkably, it structured its hedge so that it would be paid for by the policyholders. So you now had the result was a total absurdity. The policyholders wound up paying for hedges going in both directions. The consent order, paragraph 8, describes the changes as effectively changed the nature of the product that the policyholders purchased. How could this happen? In unilaterally changing the terms of its annuity contracts, AXA acted egregiously. AXA acted brazenly, but AXA did not act deceptively. The annuity contracts were drafted by AXA and predictably are one-sided. One of the few provisions providing protection for policyholders is section 2. Maybe it would be helpful if you give us a little framing for this by telling us why it's so good for your client that they weren't deceived. You said they didn't act deceptively. I understand it's sluicer, but... Why they weren't deceived, because... Explain why it's a good thing for your client that your client was not deceived. That's unusual. Well, it's... I don't think it was a good... A client could do nothing. These changes were self-operative, so whether the... What's the legal significance? Well, without deception, sluicer doesn't apply. That's what I'm trying to get at. And therefore, if sluicer doesn't apply, what happens? Therefore... It goes back to Connecticut State Court. I was just trying to... Go ahead. All right, I'm sorry. No, no. All right, so section 205, which is at A113, at the beginning says, changes in these accounts are subject to compliance with applicable law. This provision is separate, completely separate from a notification provision that applies later, that comes in later in section 205, which seems to be the focal point of the district court's decision, although it is not part of Mr. O'Donnell's complaint. There is nothing in the complaint about notification for the simple reason that both the district court and AXA acknowledged that AXA provided adequate notification in the form of a prospectus supplement prior to the implementation of the ATM strategy. Nevertheless, the district court completely misconstrued Mr. O'Donnell's contract claim. Let me... At A595, the district court says, AXA's alleged failure to obtain proper approval prior to making the material change was a violation of the contract precisely and solely because the policyholders lacked knowledge. As the record established, the policyholders received notice of these changes in a prospectus supplement. There's no... As I understand it, the element of deception, omission, and so on, that is said to adhere in this case, is that AXA changed the policy terms and was able to do so only because it misrepresented to the Department of Financial Security, of the financial services here in New York, that the change was immaterial. And the Department of Financial Services said, oh, no, that was a misrepresentation, that was a critical omission to them. And if they had gotten notice that it was material, they would have offered a choice to your clients as to whether to opt in or not. And I think that that is the nature of the misstatement that has prompted the conclusion that SLUSA operates here. Well, first, the consent order does not say that AXA misrepresented or omitted anything. They didn't use those terms. No, they don't. They could have. And I wasn't there. AXA was there. This is what AXA... Well, if they told the Department of Financial Services that this was not a material change, then it seems to me we can proceed at least at this stage on the assumption that that was a misrepresentation. Well, I don't know what they said. They may not have said anything. They submitted their papers. And if they don't hear from the agency... Well, if they had a duty to disclose it and they didn't, then that would be a material omission. According to AXA, which issued a press release contemporaneous with the consent order, and that's found at A251, the regulatory authorities has completed its review and found that AXA equitable should have communicated better to the regulatory authorities when it made certain technical filings required under New York law. That doesn't sound like fraud. Now, I assume AXA was saying... lied when they issued this press release. Plus, it's unlikely... I mean, insurance companies have a lot of nerve, but it's very unlikely that AXA would be lying to the insurance department, on the one hand, while at the same time filing a truthful securities prospective supplement. I mean, does that... It makes no sense to me. And according to Kingate, if the asserted basis for liability... that all reasonable inferences go to the plaintiff, and I think it's unreasonable to assume that AXA would lie to regulatory authorities while publicly disclosing the truth. So, I don't... In any event, nobody could trade. It couldn't be in connection with a purchase or sale because nobody knew what was going on while AXA was... had its filings under review. It's not a public forum. Okay, you've reserved some rebuttal, so let's hear the other side. Thank you. Thank you. Good morning, your honors. May it please the court, my name is Jay Kassner on behalf of AXA Equitable. I think in a slightly strange case, the way things are going, you're going to argue that your client did indeed defraud the plaintiffs, the plaintiff or plaintiffs, and therefore you win. You know, Judge Sack, that's a great question. Certainly, if this case proceeds to the merits anywhere, whether it's... if it's looser precluded and can't be brought as a class action, and Mr. Pfeffer in his infinite wisdom with his client chooses to pursue an individual claim, we're going to deny that there were any misrepresentations, and I obviously... but that's irrelevant at this juncture, because the question, as Judge Jacobs asked, as Judge Sack asked, and as I know Judge Parker is familiar with in the Romano case, the question on this motion is not the business judgment of AXA. It's not what happened. It's not why. The question is whether this claim is sleutha precluded under the artful pleading standard, which requires this court, as Judge Parker penning for the majority in Romano explained, requires a look at the pleadings and the realities of the situation. Judge Jacobs, you were... all of this is in connection with... I think I understand your omission theory and the omission analysis. Why is it all of this in connection with the purchase of cellular securities? Judge Parker, I think we need to address this question in two separate ways. There are alleged omissions relating to the DFS. There are alleged omissions relating to the policyholders. The in connection with standard and the analysis differs depending upon which you're talking about. And here's why. As this court knows from the Dabit case, which I actually had the pleasure of arguing in the Supreme Court, or the Trois case, in connection with means coincides or is material to. The misrepresentations and omissions to the DFS, and just to digress for one second, counsel said to Judge Jacobs in response to his question that the consent order never uses the word omission. I would like to direct the court's attention, among others, to page A39 of the record, which is the consent order. And there's a title, AXA Equitables, quote, omissions from the Department of Insurance. Back to your question, though, Judge Parker. The decision of the DFS to approve AXA Equitable implementing this strategy was in connection with a decision to hold securities by Mr. O'Donnell and members of the class, thereby continuing to participate in the annuity that they were in, because, but for the alleged, to Judge Sack's question, the alleged misrepresentations and omissions, the strategy would never have been allowed to be implemented. But the misrepresentation, the alleged misrepresentation was in private to a state regulatory agency, right? And the disclosure came well after the fact. So I don't understand how it affected a purchase, a sale, or even a hold. As Judge Broderick in the district court observed, the public versus private nature of this filing is legally irrelevant. The reason for that is, after Dabbitt, the law is clear from the Supreme Court, as applied by this Court in the Kingate case, and I believe in the Herald case as well, the misrepresentation does not need to be made to the plaintiff. There just needs to be a misrepresentation made in connection with the purchase, or sale, or holding under SLUSA of securities. So there was an alleged omission in the complaint to the Department of Financial Services. In reliance upon that misrepresentation, AXA Equitable was able to implement a strategy. The DFS concluded that policyholders were not fully made aware, nor were they, of all of the ramifications of this strategy that was being implemented. Is that the omission you referred earlier to, omissions essentially made to the Department and omissions to the policyholders? Yes, Judge Jacobs. And you're saying the omission of the policyholders is just not explaining entirely what they were doing? The omission — well, what I'm saying is what is alleged in the complaint, and in light of the realities of this case, as Judge Parker mentioned in Romano, there was a — the Department of Financial Services determined that there was inadequate information provided to it about the impact of this strategy, and had they known this information — the consent order is clear — they may have required that annuity holders affirmatively opt in. From that — What is the — what is the omission that was made to the policyholders? That same information, Judge Jacobs. There is a contention now — They didn't — they didn't — they didn't mention it to this one, and they didn't mention it to that one. They didn't mention it to anybody. Well, Judge Jacobs, again, for these purposes, and I — I understand your question, and it's sort of akin to Judge Sack's question. I'm not standing here saying that Acts Equitable did anything wrong. No, no. This is all — this is all — this is all allegations. Right. The Department of Financial Services seems to think so, and — They do. $20 million to your client. We did. But as Your Honor knows, public companies settle with regulators all the time. But to your — yes, the contention here, and what is alleged in the complaint and the realities of the situation, is that the policyholders were not informed about the very same matters that the DFS was not informed about. Now, in the record, there appear certain — Your argument, then, is that if people knew that their investment options were being altered, they might have given up their life insurance policies with tremendous tax consequences. Well, no. Actually, Judge Jacobs, a couple of answers to that question. There were options that were available to these holders of securities. Again, we're not here litigating the merits of the claim, but — Options for particular investments within the variable annuity policy. That is correct. But isn't the variable annuity policy itself the security that we are talking about? There are two, Judge Jacobs. There are two securities. And it's undisputed on this record, and that appears at the opening brief at page 13 of my friend Mr. Pfeffer, that these are covered securities. It's clear from the Lander case that the annuity is a covered security. Within the annuity are various so-called investment divisions. If you look at Mr. O'Donnell's policy, which is in the record, he has a series of investment options available to him within what are called divisions. There's a conservative allocation. There is an aggressive allocation. They're enumerated in the policy. This implementation of the volatility management did not apply — oh, boy. Below — below those investment options, there are a bunch of mutual funds. Mr. O'Donnell purchased, or was purchased for him, when he gave the money to AXA for the annuity, AXA in turn purchased accumulation units. Those are also securities. Those are akin to the interests in the various funds that he was bought on his behalf. So they're both securities. What we're arguing is it's in connection with because he held on to those accumulation units rather than, for example, shifting them from the investments he was in to investments with a guaranteed interest rate, which was not dependent upon the stock market. He had the ability to exchange his annuity, a certain piece, every year, free of tax consequences. And let me just alert the Court. That's because it's — it's still inside the variable annuity policy. That is correct, Your Honor. That is correct. If Your Honor looks at pages A-103, A-110, A-122, A-3 — and those are examples of the types of options that he could have put in his investment in. So to answer Judge Parker, your question, it is in connection with because it was material to Mr. O'Donnell, A, because on the basis of the application about the materials that were submitted to the DFS, DFS gave approval. It's akin, Your Honors, to the decision in the Rubin case that we cite in our brief, where misrepresentations were made to the Securities and Exchange Commission by a defendant in a litigation in connection with which a registration statement was declared effective. Same thing. So is the test for material — are you arguing — are you suggesting to us that the test — the end of the day, the test for materiality is coterminous with the test for inconnection? What I'm suggesting, Judge Parker, is that the Troy's decision of the Supreme Court made that determination. In Dabbitt, the Supreme Court concluded that the inconnection with meant that it had to, quote, coincide with a purchase, sale, or holding of a security. This Court's per curiam opinion in In Re Herald, which is cited in our brief, as well as the Supreme Court decision in Troy's, concludes that it's in connection with if it is material to an investment decision. Yes, that's — The answer — your answer is that — in effect, that the inconnection with is superfluous in the sense that if it's material, it's, as a matter of law, invariably in connection. That is the way that the Troy's decision has been interpreted from the Supreme Court. Yes, Your Honor. Let me give you a hypothetical. Yes. Assume preferred shares in which a certain amount is to be paid every quarter. The company stops paying it, notwithstanding that the conditions for payment of the dividends have been met. The — the Department of Financial Services says, anything going on here? The company says, nope. And the — and a class action has begun seeking the dividends that were not paid. Is that barred by SUSA? That is a different situation than the one we have here. That's why it's a hypothetical. No, no, no. I — I understand. Your Honor, I — no, I understand that. Let's take the hypothetical, and then if — if you need to, distinguish it. Okay. So just so I understand the hypothetical, a company that is — that is subject to regulation from the DFS stops paying preferred — dividend. Yes. The DFS is what's going on, and they — they are lied to. Yes. There's nothing — nothing to see here. Okay. So the misrepresentation prong of SLUSA has been satisfied to the DFS. The question then becomes whether that is in connection with the purchase or sale or holding of a security. Well, they have people holding it. Well, yes. But I think the question in that context would be, did the fraud — would that — would the fraud have been material to or coincide with the investment decision? If what you're saying is that they were holding — I apologize, Your Honor. Were they holding because of the fact that the DFS had been lied to, or were they holding because the DFS had given the company permission? That's — that's the question in this case. No, but the — Were they holding because the DFS had been lied to, or were they holding because it was a really good deal and they were paying for something that they wanted and weren't getting? Your Honor, there are two answers to that, which is why it's so critical to distinguish your hypothetical from this case. In your hypothetical, the DFS did not give the permission to the company to stop paying the dividend. In this case, but for the DFS giving acts of permission to do what it did, it never would have happened. It was required by law, by 4240 of the New York insurance law, which is the sole basis on which the complaint claims there to have been a violation of law. Here, the allegation is the DFS was not told everything they needed to know. As a result of that, the DFS now asserts they gave permission to AXA to implement this strategy. Thereafter, they — By doing nothing, correct? No, no, no. Well, actually, the allegation, Your Honor, I have to be very careful. The allegation in the complaint is that as a result of the passage of time, under the statute, AXA was deemed to have obtained permission from the DFS to go do what it did. Yes, that is the allegation in the complaint. Whether as a matter of fact down the road, that's what gets proven. I just want to — but that is what's alleged. Yes, Your Honor, which is very, very different, Your Honor, from your hypothetical. Because in your hypothetical, the company went ahead and did it. And then the DFS said, well, what's up? And they said, oh, nothing. But they had done it already. The harm that occurred to the preferred shareholders was as a result of the unilateral decision to suspend the dividend. There was actually an application of some kind to DFS to bless this change, but it is — no action was taken, and therefore it was deemed approved because of omissions. 100 percent, Your Honor. And where that can be found is in the consent order, the whereas clauses, and specifically, Your Honor, in paragraph 2 on page 839 of the consent order. It reads, quote, in 2009, 2010, and 2011, AXA equitable filed with the New York State Insurance Department and the DFS requests to amend and restate pursuant to 4240e. Paragraph 3 on page 840 says these filings, blah, blah, blah, fail to inform. So, yes, there were filings made, which is why, with respect, it's very different than the hypothetical you asked about. Sotomayor, if you're correct, and these claims were restated purely as contract claims, but not in class form, is it AXA's position that the statute of limitations has run? Your Honor, standing — and I sort of read it. I understand the question you're asking. I understand the question you're asking. I do not know, standing here, Your Honor, whether the issue of filing — Mr. O'Donnell filed a complaint. Under typical rules, the statute would be told based upon his having filed a complaint. I don't know the answer to that question, standing here, just as a matter of law, Your Honor. The complaint is barred by SLUSA. That gets more complicated. Yes, Your Honor. Well, except, except that he certainly — and it's clear — he certainly has the right to file an individual claim. The Supreme Court made clear this is not preemption. This is preclusion for class actions only. If he wants to bring a claim, he is free to bring that claim. And I'm not — believe me, Your Honor, I want to be as candid as I can, but I just don't know the answer as to whether or not the statute would have run based upon the filing of a SLUSA complaint. But with respect, Your Honor, either the claims are SLUSA-precluded or they're not, whether the underlying claims are now barred by the statute. With respect, I know why you're asking, shouldn't make a difference to that legal analysis. It may seem unfair to the Court if that were the result. No, no. I honestly don't know, Your Honor. May I take — I know I'm so far over my time, but I want to just say what I want to say, and then if the Court does not wish to hear about it, I'll sit down. There, in the reply brief, there were some very serious allegations of forum shopping and improprieties by Judge Broderick in having accepted the Zweiman case and then the O'Donnell case as related. There's even a suggestion in there that this is akin to the situation with the stop-and-frisk case involving Judge Shindlin. I just would commend the Court in the decision of this Court relating to that situation with Judge Shindlin and stop-and-frisk, 736F3rd at 126, note 17, there is a lengthy discussion by this Court about the facts that caused that panel to reach that decision. None of those facts are here, factors are here. The assignment system was completely appropriately done, and I have to say that because there were some very scurrilous allegations made in the briefing, Your Honor, on that subject. Thank you for the additional time. I appreciate it. Sorry. On the last point, Mr. O'Donnell filed in 2015. The acts have raised jurisdictional issues. We didn't want to litigate that. We withdrew the complaint. The three complaints that followed our filing were also withdrawn. There was no appeal pending. Then, when Mrs. Wyman filed in Westchester, AXA first sent the case to Manhattan when I believe the rules are it should have been gone to White Plains, but that's of no moment. What is of moment is that AXA filed a statement of relatedness when in fact there was no case for which it could be related to, pending at that time. That was my point when they accused us of gamesmanship. We did not want, I don't think my client should have to litigate before a judge handpicked by the defendants in violation of the local rules on the distribution of business among district court judges. If I'm, I believe that the only omission or misrepresentation that AXA points to is in a caption, which is traditionally not part of an agreement or anything. The DFS could have simply said they lied to us or some words to that effect. Instead, they danced around the issue. And AXA issued its press release, which certainly didn't say anything like that. And again, AXA was publicly filing by means of a prospectus supplement an accurate statement of the changes. And I'm over my time and I don't, if materiality equals in connection with, how could you have materiality if there's full disclosure? I don't think it's possible. There was, while the case was, while the filings were under review, nobody knew about it, so they couldn't trade based on it. And before it was implemented, AXA issued its prospectus supplement. This is not Dabbitt. Dabbitt was a holder. I always wondered how you could possibly have a holder class, but that was a holder case. This is not Romano, where there was fraudulent inducement. This is just a simple, just a simple few paragraph contract claim and nothing else. Thank you. You're welcome. Thank you for your indulgence. Thank you both. Thank you both. We will reserve decision.